# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT OF THE
# WESTERN DISTRICT OF OKLAHOMA

LADENE RAMSEY BEER, et al.,     )
                        )
          Plaintiffs,    )
                        )
vs.                       )    Case No.: CIV-07-798-L
                        )
XTO ENERGY, INC., f/k/a     )
CROSS TIMBERS OIL COMPANY,    )
a Delaware corporation,      )
                        )
         Defendants.    )

---

## PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT
## FOR PLAINTIFFS, BEER AND RAMSEY, AND BRIEF IN SUPPORT

---

Edward L. White, OBA #16549    Martin S. High, OBA #20725
Edward L. White, P.C.    Edward L. White, P.C.
13924-B Quail Pointe Drive    13924-B Quail Pointe Drive
Oklahoma City, Oklahoma 73134    Oklahoma City, Oklahoma 73134
Telephone: (405) 810-8188    Telephone: (405) 810-8188
Facsimile: (405) 608-0971    Facsimile: (405) 608-0971
Email: ed@edwhitelaw.com    Email: marty@martyhigh.com

**ATTORNEYS FOR PLAINTIFFS**

**May 20, 2009**

# TABLE OF CONTENTS

|  | Page |
|---|---|

BRIEF IN SUPPORT ......................................................................... 1

UNDISPUTED MATERIAL FACTS ................................................. 2

    1. Plaintiffs have a right to receive production from wells operated by XTO for which the produced gas is processed in Timberland's Tyrone plant ......................................................... 2

    2. Timberland and CTES are wholly-owned subsidiaries of XTO ........................................................................................ 2

        a. Timberland ......................................................................... 3

        b. CTES ................................................................................. 3

    3. XTO controls Timberland and CTES ...................................... 3

    4. XTO pays Plaintiffs' royalties using a price based on a "sale" to its wholly-owned subsidiary Timberland ................... 5

    5. The named Plaintiffs' wells are both subject to the 80% contract ............................................................................. 6

    6. The market price, as established by the first arms-length transaction, is the Panhandle Eastern Pipeline Index price ("PEPL") ..................................................................... 6

    7. XTO failed to even claim, much less prove, any allowable deductions from the market price established by the sale to Duke ................................................................................... 7

    8. XTO's 20% underpayment results in damages in the amount of $7,288.40 for Plaintiff Beer and $1,661.74 for Plaintiff Boeck ................................................................... 7

    9. XTO improperly had actual control over monies rightfully owed to the Plaintiffs, so XTO owes Plaintiffs prejudgment interest in the amount of $3,828.54 ........................................ 8

ARGUMENTS AND AUTHORITIES ............................................... 8

P00057

SUMMARY JUDGMENT STANDARD ................................................................ 8

PROPOSITION I:  Owned Or Controlled Company Sales Are
An Improper Basis For Calculating Royalty Payments ............................ 9

PROPOSITION II:  The Sale To Duke Is The First One Not
Between Controlled Entities, So It Is The Only Proper Basis
For Payment Of Royalties ...................................................................... 11

PROPOSITION III:  Underpayment Of Royalties Is Readily
Determined By Adding The Discount Percentage Back Into
The Amounts Paid To Plaintiffs ............................................................. 12

PROPOSITION IV:     Class Damages Can Be Determined In
The Same Straightforward Manner As The Damages For
The Named Plaintiffs  ............................................................................ 14

PROPOSITION V:     The Producer Bears The Burden Of
Pleading And Proving Deductions From Royalty Payments
And XTO Has Done Neither Nor Can It ................................................. 15

CONCLUSION ............................................................................................ 19

P00058

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,249-
250 (1986) ................................................................................................9

*Cimmarron Transp., LLC v. Heavner,* 2008 OK 44; 186
P.3d 947 ..................................................................................................9

*Danziger v. Luse,*815 N.E.2d 658 (Ohio 2004) .........................................10, 12

*Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex. 1981) .........................11

*Holmes v. Kewanee Oil Company,* 664 P.2d 1335 (Kan. 1983)......................11

*Howell v. Texaco Inc.,* 2004 OK 92, ¶¶2, 22; 112 P.3d
1154. 1160................................................................................9, 11, 15

*Lightcap v. Mobil Oil Corp.,* 562 P.2d 1, 11 (Kan. 1977)................................11

*Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203 (1998).......................17

*Sabin v. Home Owners' Loan Corp.,* 151 F.2d 541, 542 (10th
Cir. 1945) ...............................................................................................8

*Tara Petroleum Corp. v. Hughey,* 1981 OK 65, ¶20; 630 P.2d
1269, 1275........................................................................5, 6, 10, 11, 19

*TXO Production Corp. v. State of Oklahoma, ex rel.,*
*Commissioners of the Land Office,* 1994 OK 131, 903
P.2d 259, 263 ........................................................................................7

*United States use of Edward E. Morgan Co. v. Maryland*
*Casualty Co.,* 147 F.2d 423,425 (5th Cir. 1945)........................................9

*United States v. Kansas Gas & Electric Co.,* 287 F.2d 601,
603 (10th Cir. 1961)..............................................................................9

### STATUTES

Okla. Stat., tit. 12, §727 ...........................................................................14

Okla. Stat., tit. 23, §6 ..............................................................................14

P00059

Okla. Stat., tit. 52

§570.12 ................................................................................................................17

§570.12(A)(10) ....................................................................................................17

## RULES

Fed. R. Civ. P.
    26 ........................................................................................................................16
    37 ........................................................................................................................16
    37(f) ..............................................................................................................7, 16
    56 ..........................................................................................................................8

LCvR56.1 ................................................................................................................2

P00060

## PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT FOR NAMED PLAINTIFFS AND BRIEF IN SUPPORT

Plaintiffs move the Court to grant summary judgment in their favor and against Defendant XTO Energy, Inc. f/k/a Cross Timbers Oil Company ("XTO") finding that XTO underpaid Plaintiffs' royalties. Plaintiffs ask the Court award damages to the named Plaintiffs in the sum certain of $8,950.15 and prejudgment interest in the amount of $3,828.54.[1] The total award is thus $12,778.68. An order for the Court's convenience is being submitted herewith.

## BRIEF IN SUPPORT

XTO underpaid the class by 15 or 20% by basing the payments on sale of natural gas to a wholly-owned and controlled subsidiary, Timberland Gathering & Processing Company, Inc. ("Timberland").[2] XTO owns a working interested in approximately 250 wells located in the Panhandle of Oklahoma and southwest Kansas. XTO operates these wells and "sells" the produced natural gas and liquids to Timberland, which gathers and processes it to render it ready to be marketed. Timberland, in turn, "sells" the gas to yet another XTO owned and controlled subsidiary, Cross Timbers Energy Services, Inc. ("CTES"), which does not undertake any marketing or processing. The first arms-length transaction occurs when CTES sells the gas to Duke Energy Field Services ("Duke"). At this point, the gas is in a suitable condition to enter the marketplace (the interstate

---

[1] After discovery regarding the number of wells, whether each well is subject to the 80% or 85% contract, and receipt of production and sales data, Plaintiffs will file a supplemental motion seeking damages in an amount certain on behalf of each member of the class.

[2] Production from the wells in which the named Plaintiffs have an interest are subject to the contract specifying an 80% payment (a deduction of 20%).

- 1 -

pipeline system). The law of Oklahoma and Kansas both prohibit an operator from basing royalties on sales between owned or controlled entities. Plaintiffs request that the Court enter summary judgment as a matter of law on XTO's liability to Plaintiffs for the underpayment of these royalties.

## UNDISPUTED MATERIAL FACTS

As required by LCvR 56.1, Plaintiffs submit the following undisputed material facts ("UMFs") that support summary judgment in Plaintiffs' favor and against XTO.

1. **Plaintiffs have a right to receive production from wells operated by XTO for which the produced gas is processed in Timberland's Tyrone plant.** Named Plaintiffs Ladene Ramsey Beer as both a trustee and beneficiary of the Raymond H. Ramsey and Ninetta J. Ramsey Revocable Trust ("Beer") and Katherine K. Boeck, now known as Frankl ("Boeck") both have the legal right to receive payments from their respective wells. XTO has been paying both Beer and Boeck for many years under their leases, at least since the earliest of the relevant times under the class certification order. *See* Ex. 1, exemplars of Beer's royalty statements from the Fern Parkes 1 well; Ex. 2, exemplars of Boeck's royalty statements from the Leona Woods 1 well; Ex. 3, Beer's affidavit at ¶1; Ex. 4, Boeck's affidavit at ¶1.

2. **Timberland and CTES are wholly-owned subsidiaries of XTO.** XTO owns 100% of Timberland and CTES. XTO has complete and exclusive control of both subsidiaries. This undisputed fact has been proffered multiple times by XTO officers and even XTO's counsel. Ex. 5, Trans. from Class Cert. Hearing 81:23-82:8, XTO's Sr. VP and Comptroller, Bennie Kniffen, testifying on direct:

> Q. [B]oth CTES and Timberland are wholly owned subsidiaries of XTO, correct?
> A. Yes.

- ii -

P00062

Q.  So to the extent they make money, that money would inure to XTO's benefit; is that correct?
A.  Yes.
Q.  Do they report their profits and losses separately to the SEC?
A.  No.
Q.  They report it direct to XTO; is that correct?
A.  Yes.

      a.    *Timberland.*  Ex. 6 Spaulding Dep. 31:15-18; Ex. 7, Acklie Dep. 26:11-16; Ex. 8, Dungey Aug. 21, 2008 Dep. 33:2-10; Ex. 9, Schultz Dep. 178:15-23 (XTO's counsel stating that it is "undisputed" that Timberland is a wholly-owned subsidiary of XTO).  *See also* Ex. 10, Texas Franchise Tax Public Info. Rep. for Timberland for 2001 through 2006 (Timberland was 100% owned by XTO).[3]

      b.    *CTES.*  Ex. 7, Acklie Dep. 26:11-16.  *See also,* Ex. 11, Texas Franchise Tax Public Info. Rep. for CTES for 2002 through 2005 indicating that XTO or its predecessor owns 100% of CTES).

      3.    **XTO controls Timberland and CTES**.  Both Timberland and CTES share their offices with XTO.  Ex. Ex. 7, Acklie Dep. 48:22-49:6.  It was solidly established at the Hearing on Class Certification that XTO dominates these entities.

Q.  Are there any Timberland officers who were not XTO officers or board members?
A.  Any Timberland officers who are not XTO officers?  I believe they're all the same officers.
Q.  Would you agree with me, as a wholly owned subsidiary of XTO, XTO has the right to control Timberland?
A.  Well, in certain capacities, yes, they can control Timberland, yes, sir.
Q.  XTO, as its only stockholder, can tell Timberland exactly what it wants to do, could it not?

---

[3]  Note also that all of Timberland's directors have XTO's headquarters address listed as their address.

P00063

A. I guess XTO could, if it had to, *it could tell Timberland exactly what to do*.

       \*\*\*

THE COURT: As the president of Timberland, do you maintain separate offices for your Timberland hat as opposed to your XTO hat or do you have one office in Fort Worth?

THE WITNESS: I have one office…

THE COURT: And do you have a separate legal department or anything like that who draws up the contract?...

THE WITNESS:…I think we use the same legal staff.

THE COURT: On Timberland, the board of directors…is there anybody on the board of directors that's not connected with XTO?

THE WITNESS: No.

THE COURT: And the same is true of CTES?

THE WITNESS: I'm not on the board of CTES, but I believe they're all XTO employees also.

THE COURT: There's no outside member of the board of either Timberland or CTES?

THE WITNESS: No.

Ex. 5, Hearing on Class Cert 104:18-105:4 and 292:17 to 294:9 (emphasis added)

*See also* Ex. 5, XTO's expert Kris Terry, testifying on redirect 170:4-6 ("Q. Wouldn't you agree there is common control between XTO and Timberland? A. I do."); Ex. 10, Texas Franchise Tax Public Info. Rep. for Timberland for 2001 through 2006 (all Timberland officers or directors are XTO officers); Ex. 8, Nick Dungey Aug. 21, 2008 Dep. 24:22-23. For *CTES,* see the above plus Ex.11, Texas Franchise Tax Public Info. Rep. for CTES for 2002 through 2005 (all CTES officers or directors are also XTO officers or directors); Ex. 9, Terry Shultz Dep. 12:12-23 and 15:4-11.

P00064

4. **XTO pays Plaintiffs' royalties using a price based on a "sale" to its wholly-owned subsidiary Timberland.**[4] Ex. 12, March 29, 1996 Gas Purchase Contract between XTO and Timberland (Dep. Ex. 20) (for a first group of wells Timberland paid XTO 80% of the price ultimately received for the gas in the first arms-length sale); Ex. 13, January 28, 2006 Ratification and Amendment to Gas Purchase Contract (Dep. Ex. 21) (renewing the 1996 Gas Purchase Contract); and Ex. 14, June 1, 1997 Gas Purchase Contract between XTO and Timberland (Dep. Ex. 47) (for a second group of wells Timberland paid XTO 85% of the price ultimately received for the gas in the first arms-length sale); and Ex. 5, Trans. from Class Cert. Hearing, 93:3-25, XTO's Sr. VP and Comptroller, Bennie Kniffen, testifying on redirect:

> Q. [T]he wellhead price is determined is the Panhandle Eastern price; is that correct?
> A. Panhandle Eastern price, I believe…
> Q. The index price.
> A. Yes, sir, it is the index price.
>     ***
> Q. So … then Timberland remits the 80% of that to XTO?
> A. Timberland remits 80% of the index price, not 80% of the revenue.
> Q. But 80% of the price?
> A. Right.

*See also* Ex. 7, Acklie Dep. 80:9-19 and 102:23-105:10 (XTO's accountant testifying that the wellhead "sale" from XTO to Timberland is not arms-length); Ex. 9, Terry Schultz

---

[4] Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. ***The key is common control of the two entities.***

*Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275 (emphasis added).

P00065

## PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT FOR NAMED PLAINTIFFS AND BRIEF IN SUPPORT

Plaintiffs move the Court to grant summary judgment in their favor and against Defendant XTO Energy, Inc. f/k/a Cross Timbers Oil Company ("XTO") finding that XTO underpaid Plaintiffs' royalties. Plaintiffs ask the Court award damages to the named Plaintiffs in the sum certain of $8,950.15 and prejudgment interest in the amount of $3,828.54.[1] The total award is thus $12,778.68. An order for the Court's convenience is being submitted herewith.

### BRIEF IN SUPPORT

XTO underpaid the class by 15 or 20% by basing the payments on sale of natural gas to a wholly-owned and controlled subsidiary, Timberland Gathering & Processing Company, Inc. ("Timberland").[2] XTO owns a working interested in approximately 250 wells located in the Panhandle of Oklahoma and southwest Kansas. XTO operates these wells and "sells" the produced natural gas and liquids to Timberland, which gathers and processes it to render it ready to be marketed. Timberland, in turn, "sells" the gas to yet another XTO owned and controlled subsidiary, Cross Timbers Energy Services, Inc. ("CTES"), which does not undertake any marketing or processing. The first arms-length transaction occurs when CTES sells the gas to Duke Energy Field Services ("Duke"). At this point, the gas is in a suitable condition to enter the marketplace (the interstate

---

[1] After discovery regarding the number of wells, whether each well is subject to the 80% or 85% contract, and receipt of production and sales data, Plaintiffs will file a supplemental motion seeking damages in an amount certain on behalf of each member of the class.

[2] Production from the wells in which the named Plaintiffs have an interest are subject to the contract specifying an 80% payment (a deduction of 20%).

- 1 -

P00066

pipeline system). The law of Oklahoma and Kansas both prohibit an operator from basing royalties on sales between owned or controlled entities. Plaintiffs request that the Court enter summary judgment as a matter of law on XTO's liability to Plaintiffs for the underpayment of these royalties.

## UNDISPUTED MATERIAL FACTS

As required by LCvR 56.1, Plaintiffs submit the following undisputed material facts ("UMFs") that support summary judgment in Plaintiffs' favor and against XTO.

1.   **Plaintiffs have a right to receive production from wells operated by XTO for which the produced gas is processed in Timberland's Tyrone plant**. Named Plaintiffs Ladene Ramsey Beer as both a trustee and beneficiary of the Raymond H. Ramsey and Ninetta J. Ramsey Revocable Trust ("Beer") and Katherine K. Boeck, now known as Frankl ("Boeck") both have the legal right to receive payments from their respective wells. XTO has been paying both Beer and Boeck for many years under their leases, at least since the earliest of the relevant times under the class certification order. *See* Ex. 1, exemplars of Beer's royalty statements from the Fern Parkes 1 well; Ex. 2, exemplars of Boeck's royalty statements from the Leona Woods 1 well; Ex. 3, Beer's affidavit at ¶1; Ex. 4, Boeck's affidavit at ¶1.

2.   **Timberland and CTES are wholly-owned subsidiaries of XTO**. XTO owns 100% of Timberland and CTES. XTO has complete and exclusive control of both subsidiaries. This undisputed fact has been proffered multiple times by XTO officers and even XTO's counsel. Ex. 5, Trans. from Class Cert. Hearing 81:23-82:8, XTO's Sr. VP and Comptroller, Bennie Kniffen, testifying on direct:

> Q. [B]oth CTES and Timberland are wholly owned subsidiaries of XTO, correct?
> A. Yes.

- 2 -

P00067

Q. So to the extent they make money, that money would inure to XTO's benefit; is that correct?
A. Yes.
Q. Do they report their profits and losses separately to the SEC?
A. No.
Q. They report it direct to XTO; is that correct?
A. Yes.

     a.   *Timberland*. Ex. 6 Spaulding Dep. 31:15-18; Ex. 7, Acklie Dep. 26:11-16; Ex. 8, Dungey Aug. 21, 2008 Dep. 33:2-10; Ex. 9, Schultz Dep. 178:15-23 (XTO's counsel stating that it is "undisputed" that Timberland is a wholly-owned subsidiary of XTO). *See also* Ex. 10, Texas Franchise Tax Public Info. Rep. for Timberland for 2001 through 2006 (Timberland was 100% owned by XTO).[3]

     b.   *CTES*. Ex. 7, Acklie Dep. 26:11-16. *See also*, Ex. 11, Texas Franchise Tax Public Info. Rep. for CTES for 2002 through 2005 indicating that XTO or its predecessor owns 100% of CTES).

     3.   **XTO controls Timberland and CTES**. Both Timberland and CTES share their offices with XTO. Ex. Ex. 7, Acklie Dep. 48:22-49:6. It was solidly established at the Hearing on Class Certification that XTO dominates these entities.

Q. Are there any Timberland officers who were not XTO officers or board members?
A. Any Timberland officers who are not XTO officers? I believe they're all the same officers.
Q. Would you agree with me, as a wholly owned subsidiary of XTO, XTO has the right to control Timberland?
A. Well, in certain capacities, yes, they can control Timberland, yes, sir.
Q. XTO, as its only stockholder, can tell Timberland exactly what it wants to do, could it not?

---

[3] Note also that all of Timberland's directors have XTO's headquarters address listed as their address.

P00068

A.  I guess XTO could, if it had to, *it could tell Timberland exactly what to do*.

        \*\*\*

THE COURT:  As the president of Timberland, do you maintain separate offices for your Timberland hat as opposed to your XTO hat or do you have one office in Fort Worth?

THE WITNESS:  I have one office…

THE COURT:  And do you have a separate legal department or anything like that who draws up the contract?...

THE WITNESS:…I think we use the same legal staff.

THE COURT:  On Timberland, the board of directors…is there anybody on the board of directors that's not connected with XTO?

THE WITNESS:  No.

THE COURT:  And the same is true of CTES?

THE WITNESS:  I'm not on the board of CTES, but I believe they're all XTO employees also.

THE COURT:  There's no outside member of the board of either Timberland or CTES?

THE WITNESS:  No.

Ex. 5, Hearing on Class Cert 104:18-105:4 and 292:17 to 294:9 (emphasis added)

*See also* Ex. 5, XTO's expert Kris Terry, testifying on redirect 170:4-6 ("Q. Wouldn't you agree there is common control between XTO and Timberland?  A.  I do."); Ex. 10, Texas Franchise Tax Public Info. Rep. for Timberland for 2001 through 2006 (all Timberland officers or directors are XTO officers); Ex. 8, Nick Dungey Aug. 21, 2008 Dep. 24:22-23.  For *CTES,* see the above plus Ex.11, Texas Franchise Tax Public Info. Rep. for CTES for 2002 through 2005 (all CTES officers or directors are also XTO officers or directors); Ex. 9, Terry Shultz Dep. 12:12-23 and 15:4-11.

- 4 -

P00069

4.    **XTO pays Plaintiffs' royalties using a price based on a "sale" to its wholly-owned subsidiary Timberland.**[4] Ex. 12, March 29, 1996 Gas Purchase Contract between XTO and Timberland (Dep. Ex. 20) (for a first group of wells Timberland paid XTO 80% of the price ultimately received for the gas in the first arms-length sale); Ex. 13, January 28, 2006 Ratification and Amendment to Gas Purchase Contract (Dep. Ex. 21) (renewing the 1996 Gas Purchase Contract); and Ex. 14, June 1, 1997 Gas Purchase Contract between XTO and Timberland (Dep. Ex. 47) (for a second group of wells Timberland paid XTO 85% of the price ultimately received for the gas in the first arms-length sale); and Ex. 5, Trans. from Class Cert. Hearing, 93:3-25, XTO's Sr. VP and Comptroller, Bennie Kniffen, testifying on redirect:

> Q. [T]he wellhead price is determined is the Panhandle Eastern price; is that correct?
> A. Panhandle Eastern price, I believe...
> Q. The index price.
> A. Yes, sir, it is the index price.
>            ***
> Q. So ... then Timberland remits the 80% of that to XTO?
> A. Timberland remits 80% of the index price, not 80% of the revenue.
> Q. But 80% of the price?
> A. Right.

*See also* Ex. 7, Acklie Dep. 80:9-19 and 102:23-105:10 (XTO's accountant testifying that the wellhead "sale" from XTO to Timberland is not arms-length); Ex. 9, Terry Schultz

---

[4] Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. ***The key is common control of the two entities.***

*Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275 (emphasis added).

- 5 -

P00070

Jan. 10, 2008 dep. 113:16-20; Ex. 20, Terry Schultz Sept. 18, 2008 dep. 46:4-12; Ex. 21, XTO's expert Kris Terry dep. 55:11-16; and Ex. 5, Trans. from Class Cert. Hearing 78:4-8.

5. **The named Plaintiffs wells are both subject to the 80% contract**. Osborn receives royalties from the Leona Woods 1 well, and Beer from the Fern Parks 1 well. *See* Ex. 1, exemplars of Beer's royalty statements; and Ex. 2, exemplars of Boeck's royalty statements. The Leona Woods and Fern Parks 1 wells are covered by the Mar.29, 1996 Gas Purchase Contract. Ex. 12 at prod. p. XTO 1048 and 1051. The Mar. 29, 1996 Gas Purchase Contract specifies that XTO receives "eighty percent (80%) of the Weighted Average Residue Price...." Ex.12 at prod. p. XTO 1030 (Art. V, Sec. 1). Therefore, the wells from which Plaintiffs receive royalties are covered by the 80% contract between XTO and Timberland.

6. **The market price, as established by the first arms-length transaction, is the Panhandle Eastern Pipeline index price ("PEPL").**[5] Ex. 15, Apr. 1, 2002 Gas Purch. Cont. between CTES and Duke (Dep. Ex. 18) (at ¶5 adopting PEPL index price plus as much as $0.015 per MMBtu); and Ex. 16, Dec. 1, 2005 Am. to Gas Purch. Cont. between CTES and Duke (Dep. Ex. 23) (at ¶2 adopting PEPL less $0.01 per MMBtu).

---

[5] Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. ***The key is common control of the two entities.***

*Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275 (emphasis added).

P00071

7.   **XTO failed to even claim, much less prove, any allowable deductions from the market price established by the sale to Duke.**[6] Ex. 5, Trans. from Class Cert. Hearing 106:9-17, XTO's Sr. VP and Comptroller, Bennie Kniffen, testifying on redirect:

> Q.  And are you testifying that there's some costs that you're entitled to deduct from the royalty owners?
> A.  We deduct no costs from royalty owners.
> Q.  And you're not entitled to deduct any costs in this case, correct?
> A.  I'm not sure if we are entitled.  I just know we deduct nothing and we have no costs that we do deduct.
> Q.  You're not testifying that there are any deductible costs, are you?
> A.  I am not testifying to that.  I don't know that we are entitled to or not.

*See also* Ex. 17, XTO's Supp. Resp. to Plaintiffs' First Disc. Requests at Resp. to Req. for Prod. No. 16 (XTO does not "charge plaintiffs for transportation or processing of gas produced" from Plaintiffs' wells) and Resp. to Int. No. 23 ("XTO responds that it does not deduct any costs from plaintiffs' royalties").[7]

8.   **XTO 20% underpayment results in damages in the amount of $7,288.40 for Beer and $1,661.74 for Boeck.**

---

[6]   Even if XTO tries to now argue that the 20% discount is a proxy for costs chargeable to the royalty owners, it will have to affirmatively prove those costs, and it will further have to prove that they are not gathering, dehydration, or compression costs which are not deductible.  *TXO Production Corp. v. State of Oklahoma, ex rel., Commissioners of the Land Office*, 1994 OK 131, 903 P.2d 259, 263 ("costs for compression, dehydration and gathering are not chargeable [costs]...because such processes are necessary to make the product marketable under the implied covenant to market").

[7]   Fed. R. Civ. P. 37(f) bars a party from using information it failed to produce in response to a discovery request: "If a party fails to provide information... the party is not allowed to use that information...to supply evidence on a motion, at a hearing...unless the failure was substantially justified or is harmless." *See* Prop. VI, below, arguing that this provision should bar XTO from introducing any evidence of costs it now claims are deductible.

- 7 -

P00072

Q…[I]f you knew the MMBtu factor, the Panhandle Eastern Index for that particular month, and which of the two contracts it was under, you would know how much royalty was potentially payable; is that correct?
A. Yes.…
Q. Wouldn't you agree with me…that…if the Court determined that 100 percent was applicable instead of 80 or 85, he could plug in that 100 percent?
A. Yes. If you ignore any costs or anything else in between the wellhead and the downstream price, the answer would be yes.[8]

     ***

A. I agree, it's a simple calculation.

Ex. 5, Trans. from Class Cert. Hrg. at 112:6-20 and 118:14-119:2 (XTO's expert Kris Terry testifying on direct). This damages calculation is easily performed with appropriate production data. *See* Ex. 18, Named Plaintiffs' Royalty Underpayment Spreadsheet (through Dec. 31, 2008).

    9.    **XTO improperly had actual control over monies rightfully owed to the Plaintiffs, so XTO owes Plaintiffs prejudgment interest in the amount of $3,828.54**. *See* Ex. 18, Named Plaintiffs' Royalty Underpayment Spreadsheet.


## ARGUMENTS AND AUTHORITIES

## SUMMARY JUDGMENT STANDARD

The purpose of FRCP 56 "is to permit speedy and expeditious disposal of cases where the pleadings do not as a matter of fact present any substantial questions for determination." *Sabin v. Home Owners' Loan Corp.*, 151 F.2d 541, 542 (10th Cir. 1945). Summary judgment should be granted when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law, viewing the

---

[8] See UMF 7, above, noting that XTO has not claimed, much less proven any deductions.

P00073

evidence in the light most favorable to the nonmoving party. *United States v. Kansas Gas & Electric Co.*, 287 F.2d 601, 603 (10th Cir. 1961). In fact, where there is no issue of material fact, "[s]ummary judgments are looked upon with favor …." *United States use of Edward E. Morgan Co. v. Maryland Casualty Co.*, 147 F.2d 423, 425 (5th Cir. 1945).

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.…[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986) (internal citations omitted).

## PROPOSITION I

OWNED OR CONTROLLED COMPANY SALES ARE AN IMPROPER BASIS FOR CALCULATING ROYALTY PAYMENTS.

Oklahoma law on the issue of using owned or controlled company sales as a basis for royalty payments is direct and clear: "We hold that an intra-company gas sale cannot be a basis for calculating royalty payments." *Howell v. Texaco Inc.*, 2004 OK 92, ¶ 22; 112 P.3d 1154, 1160. In *Howell*, Texaco used a sale between a parent company and its wholly-owned division as a basis for sale. The Oklahoma Supreme Court recharacterized *Howell* thus: "[W]e found that Texaco's purported contract to purchase its own gas at the wellhead could not form the basis to establish value of gas for calculating gross production taxes." *Cimmarron Transp., LLC v. Heavner*, 2008 OK 44; 186 P.3d 947, 952 (2008).

- 9 -

P00074

XTO bases Plaintiffs' royalties on a "sale" to its wholly-owned subsidiary, Timberland. *See* UMF 4. XTO previously attempted to distinguish its practice of selling gas to a wholly-owned subsidiary (Timberland) from Texaco's practice of selling to a company division. XTO argued that this is a different type of transaction, since XTO and Timberland are "separate" corporations. The Court appeared skeptical of this argument at the class certification, and it has not gotten any better with time. The key element in determining whether a payment may form a proper basis for payment of royalties is common control of the two companies, and XTO clearly controls Timberland. In *Tara Petroleum v. Hughey*, the Oklahoma Supreme Court pointed out:

> Courts should take care not to allow lessors to be deprived or defrauded of their royalties by their lessees entering into illusory or collusive assignments or gas purchase contracts. Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. ***The key is common control of the two entities.***

*Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275 (emphasis added).

Is Timberland an entity related to XTO? Is Timberland receiving a higher price on resale than it paid to XTO? Yes, on both counts. *See* UMFs 2 and 3. Timberland is a wholly-owned subsidiary of XTO as evidenced multiple times by XTO's own personnel and documents submitted to the State of Texas. Does XTO control Timberland? Absolutely. *See* UMFs 2 and 3. *Danziger v. Luse*, 815 N.E.2d 658 (Ohio 2004) (finding that the parent controlled the subsidiary because, *inter alia*, it owned all the subsidiary's stock, they shared offices, all of the officers of the subsidiary were employees or officers of the parent).

- 10 -

P00075

The evidence is overwhelming and incontrovertible that XTO wrongly bases the royalty payments on a sale to a wholly-owned subsidiary that it controls. Under *Howell* and *Tara*, this is an unlawful basis for the payments of royalties.

## PROPOSITION II

### THE SALE TO DUKE IS THE FIRST ONE NOT BETWEEN CONTROLLED ENTITIES, SO IT IS THE ONLY PROPER BASIS FOR PAYMENT OF ROYALTIES.

The first "sale" of Plaintiffs' gas is to Timberland, a wholly-owned and controlled subsidiary. *See* UMFs 2 and 3. The second "sale" is from Timberland to CTES, another wholly owned subsidiary. *See* UMFs 2 and 3. Only when CTES sells the gas to Duke, at the same point at which it "buys" the gas from Timberland, do we have a true, arms-length sale. *See* UMF 7. This is the sales price upon which all royalties must lawfully be based, since it is the first sale that is not between XTO and an entity it owns or controls.

> Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price.

*Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275. *See also Howell v. Texaco Inc.*, 2004 OK 92, ¶ 22; 112 P.3d 1154, 1160 ("an intra-company gas sale cannot be a basis for calculating royalty payments").[9] Absent proof of some

---

[9] Kansas law, while not directly applicable to this motion for summary judgment, which only relates to the named plaintiffs' claims, is in accord. *See Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 11 (Kan. 1977). *Lightcap* held that the market value of gas is the "price which would be paid by a willing buyer to a willing seller in a free market." *Id.* at Syl. ¶4. Comparable sales can be used to determine market price where "[c]omparable sales of gas are those comparable in time, quality, quantity, and availability of marketing outlets." *Holmes v. Kewanee Oil Company*, 664 P.2d 1335, 1341 (Kan. 1983) (quoting

- 11 -

P00076

allowable and proper deductions by XTO, it must pay the value it receives in the first arms-length transaction, to wit: the sale from CTES to Duke. This sale from CTES to Duke is the first arms-length transaction, and it occurs at the market price as measured by the PEPL. *See* UMF 6.

## **PROPOSITION III**

UNDERPAYMENT OF ROYALTIES IS READILY DETERMINED BY ADDING THE DISCOUNT PERCENTAGE BACK INTO THE AMOUNTS PAID TO PLAINTIFFS.

XTO must pay Plaintiffs for royalties associated with production from two wells, for which the gas is processed through Timberland's Tyrone Plant. *See* UMF 1. The computation of underpayment of royalties is straightforward. Bennie Kniffen, XTO's corporate controller, said that if the royalty payment is based on 100% of the amount received by XTO from Timberland, as opposed to the 80% currently used, this could be easily be programmed into XTO's internal payment computations. *See* Ex. 5, Trans. from Class Cert. Hrg. at 85:4-13. In addition, the underpayment can readily be performed using a spreadsheet. *See* Ex. 18, Named Plaintiffs' Royalty Underpayment Spreadsheet. The formula for royalty underpayment for any given month can be represented with a simple formula:

| |
|---|
| Royalty Underpayment = (Ownership Decimal) x (Volume) x (BTU Factor) x (Price) x (Discount Factor) |

*Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex. 1981)). The Plaintiffs can prove that XTO's sale to itself is unreasonable and the "comparable" sale of gas to Duke serves as the market price upon which the royalty should be calculated.

P00077

Where the "Ownership Decimal" is the decimal interest that the royalty owner has in the well (for example, someone having a full 1/8 interest in a well would have an 0.125 decimal), "Production Volume" is the monthly production volume from the well in thousands of cubic feet (MCF),[10] "BTU Factor" is the measured energy content of the natural gas in millions of BTU's per MCF (MMBtu/MCF), and "Price" is the PEPL as published in Inside FERC per the contract between CTES and Duke in dollars per million of BTUs ($/MMBTU). The "Discount Factor" of 0.20 represents the underpayment owed to the royalty owners, such as the named Plaintiffs, subject to the 80% contract. *See* UMF 5.[11]

The underpayment has been calculated beginning with the appropriate Relevant Time as specified in the class definition (March 25, 1997 for the Woods well owned by Boeck since she opted out of the *Booth* Settlement, and July 1, 2002 for the Fern Parkes well owned by Beer since she was a member of the *Booth* class). See Class Cert. Order (Doc. 97) at 17. Data is only available through December 31, 2008, and new damages have accrued in 2009. Additional damages will continue to accrue until XTO's payment practices are modified. Thus, additional damages between Jan. 1, 2009 and the date of the Court's ruling will accrue, and will have to be added to the ultimate award subject to a supplemental brief to be filed after the Court's order documenting those additional

---

[10]  XTO, as it is required to do, pays Plaintiffs on the full produced wellhead volume, unreduced by gas consumed in compressors or the like. Ex. 5, Trans. from Class Cert. Hrg. at 108:3-19.

[11]  XTO applied a "Discount Factor" of 0.15 to a minority of the class wells, so the factor used to calculate their damages will be the 0.15 factor, rather than 0.20.

- 13 -

P00078

damages. Plaintiffs also plan to file a subsequent motion seeking an injunction requiring royalty payments to be based on the sale to Duke.

The damages are "capable of being made certain by calculation" and "the right to recover which is vested…upon a particular day." Okla. Stat., tit. 23, § 6. Therefore, the Plaintiffs are entitled to prejudgment interest. Prejudgment interest has been computed per Okla. Stat., tit. 23, § 6 and tit. 12, § 727. *See* UMF 9 (calculations supporting interest owed to Plaintiffs). Based on these calculations, the amount of underpayment is readily determined for Ms. Boeck and Beer. Accrued interest is also easily calculated.

## PROPOSITION IV

CLASS DAMAGES CAN BE DETERMINED IN THE SAME STRAIGHTFORWARD MANNER AS THE DAMAGES FOR THE NAMED PLAINTIFFS.

Damages can be just as easily determined for the entire class as for Boeck and Beer. The formula is identical:

Royalty Underpayment = (Ownership Decimal) x (Volume) x (BTU Factor) x (Price) x (Discount Factor)

Presently, Plaintiffs do not have information for all of the affected wells and royalty owners to allow these calculations to be performed on a class-member-specific basis. As soon as discovery is re-started, Plaintiffs will propound discovery requests for the information needed to perform calculations for each class member. XTO has all of the relevant information in its computer databases, and it has used the information to calculate royalties for prior time frames and uses the information to calculate royalty payments on a monthly basis.

- 14 -

The information required to complete the calculations for the entire class is easily identifiable and readily available to XTO. The information required from XTO is as follows: 1) the BTU Factor, in MMBTU/MCF, for each well over the time periods that the well produced gas, 2) the name of each well, 3) the name and other contact information of the royalty owner of each well, 4) the decimal ownership of each royalty owner, and 5) the monthly volume of gas produced from each well in MCF. The PEPL price is readily obtainable from the publisher of <u>Inside FERC – Gas Marketing Reporter</u>. XTO has used the information required by Plaintiffs in the past to perform their monthly calculations. A sample discovery request to XTO is shown in Exhibit 19, and it will be sent shortly after the filing of this Motion.

## PROPOSITION V

### THE PRODUCER BEARS THE BURDEN OF PLEADING AND PROVING DEDUCTIONS FROM ROYALTY PAYMENTS AND XTO HAS DONE NEITHER NOR CAN IT.

It is clear under Oklahoma law that the producer has the responsibility of proving any costs that can be deducted from the royalty payment. "The burden is on the producer to justify the costs and expenses. Because it is in the producer's best interest to maximize the costs and expenses, the courts must carefully scrutinize the figures to determine the correct amount." *Howell*, 2004 OK at ¶ 2; 112 P.3d at 1160. Any costs that are deductible from the royalty must be affirmatively proven by the producer. *Id.* As the *Howell* court stated it is clearly in the producer's interest to maximize expenses that could be charged the royalty owner and maximize the producer's profit. "Because it is in the

- 15 -

producer's best interest to maximize the costs and expenses, the courts must carefully scrutinize the figures to determine the correct amount." *Id.*

XTO has failed to disclose any information pertinent to deductions that they might have incurred to make the natural gas marketable, and XTO has failed to meaningfully respond to specific discovery requests for such information despite repeated communications requesting such information. *See* UMF 7. Further, XTO has failed to disclose any information relative to any allowable deductions under its duty to disclose under to Fed. R. Civ. P. 26. Thus, under Fed. R. Civ. P. 37(f), XTO is barred from now using such information in response to a motion:

> If a party fails to provide information… the party is not allowed to use that information…to supply evidence on a motion, at a hearing…unless the failure was substantially justified or is harmless.

Any information that XTO possesses concerning deductions that it considers to be allowable at this point in the case should not be admitted either in a response to this motion or at a hearing.

If XTO is permitted to introduce evidence that it has allowable deductions despite the Fed. R. Civ. P. 37 prohibition, the Court should recognize that XTO has the duty to affirmatively prove that these deductions are reasonable. "The lessee bears the burden of showing that such cost is reasonable, and that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest…. [W]hether the royalty interest must bear transportation costs away from the lease will depend upon whether the lessee can meet its burden." *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, ¶ 18, 954 P.2d 1203, 1208. Given that XTO has unwilling to disclose such costs,

- 16 -

P00081

it is unlikely that any such costs are reasonable under *Mittelstaedt*. In any case, any proposed costs at this late date must be viewed skeptically by the Court. XTO bears the burden to both plead and prove deductions, and it has repeatedly denied the existence of any deductions.

Assuming that XTO decides to come forward with newfound deductions that it now wants to charge to the royalty owners, then XTO would have failed to comply with Okla. Stat. tit 52, § 570.12, which requires XTO to provide specific information so that the royalty owner has information to monitor the lessee:

> A. The following information for each property and month of sale shall be included with each payment made to an interest owner from the sale of oil or gas…
>   8. Owner's share of the total value of sales attributed to such payment prior to any deductions;…
>   10. A specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner upon request by the owner.[12]

XTO has failed to specify any deductions to the plaintiffs before or during this litigation. Further, the value of total sales as provided by XTO is the pre-deduction value. Most definitely XTO has had notice that the deductions are at issue and XTO has had multiple opportunities during pleading, interrogatories, depositions and hearings to assert that XTO has such deductions. In fact, XTO has represented just the opposite, that

---

[12] Though not specifically required by statute, a producer obviously must include information on the total amount of deductions to arrive at the actual price to be paid to the royalty owner. The operator could not arrive at the amount payable without subtracting out any applicable deductions. §570.12(A)(10) specifies that the details regarding what is deducted need only be provided upon "request by the owner."

- 17 -

it has no deductions. *See* UMF 7. XTO cannot have it both ways. It cannot ignore Oklahoma statues by not reporting deductions, repeatedly deny that deductions exist, and now expect to be able to use any "found" deductions to escape liability. In fact, Plaintiffs submit that the repeated, monthly royalty statements generated before and during this litigation are conclusive proof that there are no deductions.

In responding to this motion, XTO will likely disclose information on purported deductible costs while ignoring the elephant in the room: liquids produced from the Tyrone Plant. To date, Plaintiffs have gone along with an accounting shortcut employed by XTO, to wit: rather than adding up all the revenue streams from the system -- sale of residue gas and liquids -- then determining which costs may be deductible and subtracting those from the total revenue, XTO has determined a price for all of the produced BTUs in a gaseous state and multiplied the total BTUs produced times that price. The method employed by XTO is simpler than fully accounting for all of the system variables. Plaintiffs forewarn the Court that XTO may choose to tell only part of the story by focusing on purported deductible costs without accurately disclosing the revenue it garners from liquid sales. The value of liquids is as much as 30% of the total revenue from the Timberland system. Plaintiffs encourage the Court to analyze this case using the simplified accounting procedures XTO itself employed. However, if XTO argues for, and the Court accepts, a more detailed analysis, it must include liquid sales and not just the purported deductible costs.

- 18 -

## CONCLUSION

XTO Energy, Inc. has underpaid the Plaintiffs by 20% by basing the payments on sale of natural gas to a wholly owned and controlled subsidiary. "Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price." *Tara Petroleum Corp. v. Hughey*, 1981 OK 65, ¶ 20; 630 P.2d 1269, 1275. The royalty owners are thus entitled to payment of royalties based on the first arms-length sale of the gas to Duke. Plaintiffs request that the Court enter summary judgment as a matter of law on XTO's liability to the named Plaintiffs for the underpayment of the royalties. Plaintiffs request that XTO be ordered to pay Plaintiffs for this underpayment in the amount of $8,950.15. Further, since XTO has had control and use over the royalty payments due, Plaintiffs request that the Court order XTO to pay Plaintiffs prejudgment interest in the amount of $3,828.54. Upon receipt of substantive responses to forthcoming class-wide discovery requests, Plaintiffs will extend this motion to cover damages for the entire class and will seek a permanent injunction.

Respectfully Submitted,


/Edward L. White/

Edward L. White, OBA #16549
Martin S. High, OBA # 20725
13924 Quail Pointe Drive, Suite B
Oklahoma City, OK 73134
Telephone: (405) 810-8188
Facsimile: (405) 608-0971
**ATTORNEYS FOR PLAINTIFFS**

- 19 -

P00084

## Certificate of Service

This is to certify that on May 20, 2009, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of court will transmit a Notice of Electronic Filing to the following ECF registrants:

James M. Peters – jpeters@monnethayes.com
Michael S. Peters – mpeters@monnethayes.com
Robert A. French – bfrench@monnethayes.com
              mspajp@aol.com
Mark Banner – mbanner@hallestill.com

/Edward L. White/