UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDWARD L. WHITE, P.C.,

Plaintiff,

- against -

WEST PUBLISHING CORPORATION d/b/a "West";
and REED ELSEVIER INC., d/b/a LexisNexis,

Defendants.

12-CV-1340 (JSR)
ECF CASE

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITON TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Gregory A. Blue
GREGORY A. BLUE, P.C.
405 Lexington Avenue, Suite 2600
New York, New York 10174
Telephone: (646) 351-0006
Facsimile: (212) 208-6874
Email: blue@bluelegal.us

Raymond A. Bragar
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Ave., Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Facsimile: (212) 208-2519
Email: bragar@bespc.com

*Attorneys for Plaintiff*

## **Table of Contents**

Table of Authorities ........................................................................................................... iii

Preliminary Statement ........................................................................................................ 1

I.       Defendants' copying is not protected by the doctrine of "fair use." ...................... 2

       A.       The purpose and character of the Defendants' use of the works
            weighs heavily against a finding of "fair use." ........................................... 2

            1.       The Defendants' copying was not transformative. ........................ 2

            2.       The Defendants' use is commercial in nature. ............................... 7

       B.       The nature of the registered works weighs against a finding of fair
            use. ............................................................................................................... 7

       C.       The amount and substantiality of the portion used in relation to the
            copyrighted use as a whole weighs heavily against a finding of fair
            use. ............................................................................................................. 10

       D.       The effect of the use upon the potential market for or value of the
            copyrighted work does not favor a finding of fair use. ............................. 12

       E.       The Defendants' argument that they are providing a public benefit
            does not support a finding of "fair use" .................................................... 14

II.      Defendants did not have an express or implied license to copy, distribute, and
     display the Works. ................................................................................................ 18

III.     Plaintiff is Entitled to Remedies for Defendants' Infringement. ......................... 20

Conclusion      .................................................................................................................... 22

## Table of Authorities

### CASES

*Arica Inst., Inc. v. Palmer,* 970 F.2d 1067 (2d Cir. 1992) ................................................................ 9

*Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011) ........................ 17, 21

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991) ........... 7

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 1992) ......... 5, 10

*Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994) .................................................. 2, 14

*Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86 (S.D.N.Y. 1996) .................. 18

*EMI Latin v. Bautista,* 2003 U.S. Dist. LEXIS 2612 (S.D.N.Y. Feb. 24, 2003) .......... 19, 20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ...................................... 9

*Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) ........................................... 19

*Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*,
   621 F.2d 57 (2d Cir. 1980) .................................................................................. 16, 17

*Kelly v. Ariba Soft Corp.*, 336 F.3d 811 (9th  Cir. 2003) .................................................. 4

*Marvin Worth Prods. v. Superior Films Corp.*, 319 F. Supp. 1269 (S.D.N.Y.
   1970) ................................................................................................................................ 8

*McIntosh v. N. Cal. Universal Enters. Co.*, 670 F. Supp. 2d 1069 (E.D. Cal. 2009) ......... 8

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) ................................... 13

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .............................. 4

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261
   (E.D.N.Y. 2011) ............................................................................................................. 21

*Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362 (E.D. Va. 1995) ............................... 8

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................................... 21

*SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000) ..... 18, 20

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .......................... 7

*Swatch Group Mgmt. Servs. v. Bloomberg L.P.*,
   2012 U.S. Dist. LEXIS 70045 (S.D.N.Y. May 17, 2012) .............................................. 11

*Vanderhye v. iParadignms, LLC* 562 F.3d 630 (4th Cir. 2009) ........................................ 6

### STATUTES

17 U.S.C. § 107 ................................................................................................... 2, 10, 12

## **Preliminary Statement**

Plaintiff respectfully submits this Memorandum of Law in Opposition to Defendant West Publishing Corporation's ("West"), and Reed Elsevier Inc.'s ("Lexis") Motions for Summary Judgment (the "Defendants' SJ Motions").

As the Court is aware, Plaintiff filed its own Motion for Summary Judgment, which is being briefed and argued on the same schedule as Defendants' SJ Motions.   In Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment,[1] Plaintiff presented legal argument on the issue of infringement and fair use. To avoid burdening the Court with duplicative briefing, Plaintiff incorporates by reference the arguments made therein.

Because almost all the underlying facts are not in dispute, there are only three open issues on these motions: whether Defendants can prove their entitlement to the "fair use" affirmative defense, whether Plaintiff has impliedly licensed its works to Defendants, and the remedies to which Plaintiff is entitled.

Defendants cannot carry their burden of proving "fair use."  All of the factors in the "fair use" analysis either weigh strongly *against* a finding of "fair use," or are, at worst, neutral.  An analysis of each of the "fair use," factors shows that the Defendants simply copied the entirety of the Works for distribution, display, and sale, without transformation, for their own commercial purposes.  There is no sense in which that is "fair use."

It is also clear that Plaintiff has not impliedly licensed the Works.  The Defendants cannot point to any overt act by the Plaintiff that would indicate assent to the

---

[1] "Plaintiff's SJ Mem.", Dkt. No. 55.

Defendants' use, and therefore cannot prove that there was a "meeting of the minds" on a license arrangement.

On this record, the Plaintiff is entitled to summary judgment on liability, and it is uncontroverted that Plaintiff, if successful, is entitled to some form of relief for Defendant's copying. As a result, the Defendants' Motions for Summary Judgment should be denied.

**I.      Defendants' copying is not protected by the doctrine of "fair use."**

The Defendants have asserted that their copying, distribution, and display of the Works are "fair use" under § 107 of the Copyright Act.  The Defendants, of course, have the burden of demonstrating "fair use." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 590 (1994).  They have not, and cannot, carry that burden.

**A.      The purpose and character of the Defendants' use of the works weighs heavily against a finding of "fair use."**

**1.      The Defendants' copying was not transformative.**

In determining whether the Defendants' copying is excused by the doctrine of "fair use," the Court should determine the extent to which the Defendants' copying is "transformative."

In claiming that its works are "transformative," Lexis (but not West) argues that it makes substantive "enhancements," including:

- determining whether to include a document in its database;

- determining whether "the document should be split into multiple documents;

- reviewing the document for, and redacting, sensitive information;

- capturing data such as the case name, court name, and type of document (all of which are readily apparent from the caption);

- converting the document into a different file format; and

- creating hyperlinks from citations and to other court documents.

[Lexis SJ Br.[2] at pp. 4-5.]  The remarkable thing about this list of claimed "enhancements," is that they either have nothing to do with substantively improving or commenting on the content of the Works (*e..g.* selection of the documents, splitting the documents), or simply make the content of the Defendants' databases  searchable (capturing the court name, creating hyperlinks).  While Lexis touts this sort of work as remarkably beneficial and transformative, all of these purported "enhancements" are designed to facilitate the Defendants' unlawful sale of the briefs and pleadings.  That is not transformation.[3]

Both Defendants argue that the databases are transformative because they are put to different uses than the original Works.  While the the purpose of the Works is "legal advocacy" [West SJ Br.[4] at p. 13], Defendants disclaim any interest in that purpose, arguing that they "do not seek to compete with Plaintiff in rendering advice to clients and writing briefs and motions on their behalf."  [*Id.*]  It is self-evident, though, that the purpose of Defendants' databases is to allow their *subscribers* to engage in legal advocacy by downloading (and cutting-and-pasting from) briefs and pleadings to put them to exactly the same use for which they were written. The whole point of

---

[2] "Lexis SJ Br." refers to the Memorandum of Law in Support of Defendant Reed Elsevier Inc.'s Motion for Summary Judgment, Dkt. No. 56, filed on October 5, 2012.

[3] West's Rule 56.1 Statement similarly claims that "West makes a number of enhancements to the document before uploading it onto the system," but admits that "[t]hese enhancements are designed to facilitate subscribers accessing the information the document contains, as well as related documents an cited authorities."  West Rule 56.1 Statement, ¶ 8.  In any event, West's Memorandum of Law does not argue that such "enhancements" are transformative under the "fair use" analysis.

[4] "West SJ Br." refers to the Memorandum Of Law In Support Of Defendant West Publishing Corporation's Motion For Summary Judgment, Dkt. No. 47, filed on October 5, 2012.

Defendants' briefs and pleadings offerings is to deliver a verbatim copy of legal content created by one legal advocate (the author) to another legal advocate.    The Defendants merely facilitate the transfer of a verbatim copy between people who put it to exactly the same use.  That, too, is not transformation.

The cases cited by the Defendants are not to the contrary.  In *Kelly v. Ariba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), the plaintiff was a photographer whose "images are artistic works intended to inform and to engage the viewer in an aesthetic experience. His images [were] used to portray scenes from the American West in an aesthetic manner."  336 F.3d at 818.  The defendant operated an Internet search engine that automatically generated very low quality "thumbnail" images to facilitate an Internet search, and the plaintiff's works were among those converted into thumbnail images.  But the thumbnail images were lousy substitutes for the originals.  As the Ninth Circuit explained, "[a]nyone who downloaded the thumbnails would not be successful selling full-sized images enlarged from the thumbnails because of the low resolution of the thumbnails. There would be no way to view, create, or sell a clear, full-sized image without going to [the plaintiff's] web sites."  *Id.* at 821-22.  Similarly, in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), *cert denied*, 132 S.Ct. 1713 (2012), the Ninth Circuit explained that, in employing "thumbnail" images, "a search engine transforms the image into a pointer directing a user to a source of information."  *Id.* at 1165.

Here, the Defendants' use of the Works is nothing like that at issue in the "thumbnail" cases.  Those cases were about reduced quality copies that were poor substitutes for the originals, and the use of those images to point the way to the original documents at the original source.  By contrast, the Defendants here are not creating *low* quality copies as mere "placeholders" or pointers; they are creating –in their words –

4

*enhanced* quality copies of the entire works and selling perfectly usable facsimiles of the original works themselves.  This is the exact *opposite* of creating an internet "thumbnail," and, therefore, those cases are entirely off-point.

Another of the cases cited the Defendants, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 1992), similarly involved reduced-size images that were no substitute for the originals.  That case involved "artistic concert posters reproduced in reduced size in a biography of the musical group the Grateful Dead."  *Id.* at 606.  The Second Circuit's "fair use" analysis emphasized that these were tiny reproductions, "displayed in significantly reduced form," *id.* at 607, of concert posters, used in a collage of images concerning the band, in the context of historical biography:

> DK minimized the expressive value of the reproduced images by combining them with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book. To further this collage effect, the images are displayed at angles and the original graphical artwork is designed to blend with the images and text. Overall, DK's layout ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, <u>not to exploit copyrighted artwork for commercial gain.</u>

*Id.* at 611 (emphasis added).  Once again, that case has nothing to do with Defendants' use of the Works.  Whereas the defendant in *Bill Graham Archives* was illustrating a work of historical biography by creating a collage of historical artifacts, Defendants operate a service to deliver discrete documents, one at a time, in order to "exploit copyrighted []work for commercial gain."  *Id.*  The Defendants don't create a collage; they operate giant electronic filing cabinets.

Perhaps tacitly conceding this fact, Lexis argues that "[w]ere Lexis's BPM product merely an online repository of publicly filed court documents, it would be sufficiently transformative of Plaintiff's Briefs to constitute fair use."  [Lexis SJ Br. at p.

11]  In other words, Lexis claims that it need not do *anything* to the briefs it collects, and it should still be permitted to copy them in bulk and sell them without the copyright owners' consent.

     To support that argument, the Defendants cite *Vanderhye v. iParadigms, LLC* 562 F.3d 630 (4th Cir. 2009) for the proposition that use of a copyrighted work can be "transformative" without actually altering or adding to the original work.  [Lexis SJ Br. at p. 11]  That case, however, was strikingly different from this one.  The defendant there operated a service that amassed student papers in its database in order to detect and deter plagiarism.   The database searches at issue in *iParadigms* were not designed to enable the users to locate, purchase, and download a copy of the original content for their own use; they were designed to *prevent* improper copying.

     Moreover, the *iParadigms* decision made clear that the system itself had a very limited use, and did not result in the sale or distribution of the works to third parties.  "iParadigms did not publicly disseminate or display plaintiffs' works and did not send them to any third party other than the instructor to whom plaintiffs submitted their own papers."  562 F.3d at 641 (quotation omitted).  Thus, the facts of *iParadigm* would parallel the facts here only if the Defendants disseminated the briefs at issue solely to the judge who originally read them.  Defendants, by contrast, would like to distribute the briefs in their databases as widely as possible, and sell them to as many customers as possible.  Lexis's argument, therefore, inverts the central rationale of *iParadigms,* arguing that copying an entire work to *prevent* further copying is the equivalent of copying an entire work for the purpose of *encouraging* further copying.

     For these reasons, and the reasons set forth in Plaintiff's Motion for Summary Judgment, Defendants' use is *not* transformative.

2.     **The Defendants' use is commercial in nature.**

"[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 451 (1984).  While commerciality, by itself, does not inextricably lead to the conclusion that the Defendants' copying is unfair, *Campbell*, 510 U.S. at 585, "[t]he fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use."  *Harper & Row, Publrs..*, 471 U.S. at 562.

Lexis argues that many of its *users* have a non-commercial purpose in using the databases.  [Lexis SJ Br. at p. 14]  That, however, is not the issue.  The issue, instead, is whether the *infringer* derives a commercial benefit from the copying, not on whether those *receiving* the copies do. *See Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F. Supp. 1522, 1531 (S.D.N.Y. 1991) ("The use of the Kinko's packets, in the hands of the students, was no doubt educational. However, the use in the hands of Kinko's employees is commercial.")

Here, the Defendants' use is unquestionably commercial, no matter what its users actually do with the material.[5]  Together with the fact that the Defendants' use is not transformative, the first "fair use" factor weighs against a finding of "fair use."

B.     **The nature of the registered works weighs against a finding of fair use.**

The second "fair use" factor – the nature of the copyrighted works, also weighs against a finding of fair use.

---

[5] Neither Defendant argues that the commercial nature of the copying at issue weighs in *favor* of finding "fair use."   At most, they argue that this factor "carries little weight."  [West SJ Br. at p. 14]  This factor, therefore, does not help Defendants carry their burden of proving "fair use."

As explained in Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, the filing of a document with the Clerk of the Court does not deprive an author of rights under the Copyright Act.  Courts have widely held that public filings, such as architectural drawings and exhibits to affidavits, retain protections under copyright law.  *See, e.g., McIntosh v. N. Cal. Universal Enters. Co.*, 670 F. Supp. 2d 1069, 1098 (E.D. Cal. 2009) (finding that submission of architectural plans to a public agency did not constitute general publication); *Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1367 (E.D. Va. 1995) ("the mere existence of a copyrighted work in an open court file does not destroy the owner's property interests in that work. In the same way, the placement of a copyrighted book on a public library shelf does not permit unbridled reproduction by a potential infringer.")

In *Marvin Worth Prods. v. Superior Films Corp*., 319 F. Supp. 1269 (S.D.N.Y. 1970), the defendant filmmaker claimed that he had not infringed the plaintiff's exclusive license to use comedian Lenny Bruce's copyrighted works because the portions of Bruce's works that he copied were publicly available in court files from prior criminal prosecutions against Bruce.  The defendant argued that since "a substantial portion of the material [was] derived from public sources," it was not copyrightable.  *Id*. at 1270.  The court, however, rejected this theory and highlighted the absurd results that it would yield:

> I find unpersuasive the contention that the use of such material, if originally copyrighted (as is undisputed here), is rendered innocent by inclusion in legal transcripts or opinions.  To hold that such originally copyrighted material becomes somehow dedicated by use in the courts would permit the unraveling of the fabric of copyright protection. If defendants' theory were accepted, James Joyce's *Ulysses*, for example, would lie within the public domain merely because the United States prosecuted the book, unsuccessfully at that, a generation ago.

*Id*. at 1271.   Neither the PACER system, nor the Clerk's "FILED" stamp, have the magical power strip a work of protection under the Copyright Act.

In arguing that that the fact that a document is publicly filed with a government agency is relevant to the second factor, Lexis[6] cites only one case, *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067 (2d Cir. 1992).  In *Arica*, though, the Second Circuit simply found that the fact that the work was *published* tilted the second "fair use" factor (nature of the work) in favor of finding "fair use."  *Id*. at 1078.  That case had nothing to do with filing a work with a government agency or court.  Lexis's argument, therefore, contains not a single authority for assertion that Plaintiff's filing of the Works with the Clerk of the Court diminished or eliminated Plaintiff's rights under the Copyright Act.

West's sole argument on the second "fair use" factor is that the Works are more "factual" in nature, containing only "the straightforward, functional presentation of fact and law."  [West SJ Br. at p. 17]   While it is true that legal briefs and pleadings are rarely great literature (a fact that is painfully obvious to judges, as well as those of us who litigate for a living), it is also true that they feature copyrightable expression.  Even "[f]actual compilations… may possess the requisite originality."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 348 (1991).  Even though "copyright in a factual compilation is thin," the Supreme Court has explained that "a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, <u>so long as the competing work does not feature the same selection and arrangement</u>."  *Feist*, 499 U.S. at 349.   Thus, even though copyright in more factual

---

[6] West's argument on the second "fair use" factor does not discuss the fact that the Works were publicly filed, and therefore does not claim that this fact weighs in its favor with respect to the nature of the copyrighted works.  [West SJ Br. at p. 17]

works may be considered "thin," as the Defendants argue [Lexis SJ Br. at p. 15], that only means that there is more leeway to copy the *facts*, not the unique expression.

Defendants undoubtedly could report on and relate the facts and compilation of law contained in the Works. What they did, however, was much more.  They copied the whole thing, including the *precise* arrangement of the facts and law created by the Plaintiff, as well as all of Plaintiff's original expression.  No matter how "thin" the protection afforded to copyrighted works that include a selection of facts, with respect to legal briefs and pleadings it is not so thin as to be utterly non-existent.

The second "fair use" factor, therefore, also weighs against a finding of "fair use."

> **C.    The amount and substantiality of the portion used in relation to the copyrighted use as a whole weighs heavily against a finding of fair use.**

The third "fair use" factor requires the Court to consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).

Defendants' copying of the entirety of the Works tips the third "fair use" factor decidedly in Plaintiff's favor.  Defendants admit to copying the entirety of the Works. They argue however, that copying the entirety of the Works is necessary in light of the purpose of the use.  In support, Lexis cites to *Bill Graham Archives*, 448 F.3d at 613. [Lexis SJ Br. at p. 16]  As discussed above, that case involved the reproduction of very small versions of concert posters in a collage of materials represented in a book of history, and were not substitutes for the originals.  Here, Defendants are selling essentially perfect (or, as Lexis calls them, "enhanced") versions of the originals, which can be used in exactly the same way as the originals. *Bill Graham Archives* is not remotely analogous.

Lexis also cites to *Sony*, 446 U.S. at 449-50,  [Lexis SJ Br. at p. 16], which involved the propriety of recording television programs for viewing at another time (*i.e.* time shifting).  *Sony* does not, as Lexis suggests, hold that copying an entire work can tip the third "fair use" factor *in favor* of the defendant if copying the entire work is "necessary" for the defendant's use.  Instead, the Supreme Court in *Sony* simply held that, because "time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced, see § 107(3), does not have its ordinary effect of militating against a finding of fair use."  *Id.*  Judge Hellerstein, citing *Sony,* made the same point in *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 2012 U.S. Dist. LEXIS 70045 (S.D.N.Y. May 17, 2012). [cited in Lexis SJ Br. at p. 16]  In that case, involving a news agency's recording of company's call with securities analysts, the court held that while the defendant's use of the entire of a "generally weighs against fair use, it does not *preclude* a finding of fair use." *Id.* at *13.  Nothing in *Sony* or *Swatch* suggests that a defendant can turn this factor on its head and argue that copying an entire work actually *favors* a finding of fair use.

As *Sony* and *Swatch* recognized, the "ordinary effect" of copying an entire work is to militate *against* fair use.  On these facts, the Defendants' use of the entirety of the Works was not "fair use," and the Defendants cannot carry their burden of showing that this factor tips in their favor.[7]

_____

[7] West actually concedes that the third factor does not favor a finding of fair use. [West SJ Br. at p. 18 ("the third factor does not weigh against a finding of fair use"); id. at 19 and 20 (the third factor "is, at worst, neutral")]  While Lexis cites authority for the proposition that copying the entire work is sometimes "necessary," it cannot show that such copying actually tilts the third factor in its favor.

**D.    The effect of the use upon the potential market for or value of the copyrighted work does not favor a finding of fair use.**

The final factor in the "fair use" analysis is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). While the Defendants claim that their use of the Works has no effect on the market – indeed, they claim that there is no market – that argument is contrary to the law and the facts.

First, and most obviously, it is apparent from the fact that the Defendants have an active business in the sale of legal briefs and pleadings that there *is* a market for such works. While the Defendants argue that "Plaintiff does not point to any market in which it can sell or license the Briefs because no such market exists" [Lexis SJ Br. at p. 18], they admit nevertheless admit that there *is* a market, acknowledging that "Lexis has created a market for the Briefs." [Lexis Rule 56.1 Statement at ¶ 89] The fact that attorneys do not currently receive any fees or royalties from the market is simply evidence the Defendants' thievery, not the absence of a market. In that sense, the Defendants are like shoplifters stuffing their pockets while protesting that the store has nothing worth buying.

Significantly, the Defendants' argument that there is no *current* market for the Works simply misses the point. The Copyright Act, and case law, requires that the Court consider whether there is a *potential* market for the Works. 17 U.S.C. § 107(4). Specifically, it requires the Court to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant (whether in fact engaged in by the defendant or by others) would result in a substantially adverse impact on the potential market for, or value of, the plaintiff's present work." 4-13 Nimmer on Copyright § 13.05. *See Campbell*, 510 U.S. at 590 (quoting Nimmer). It is enough that Defendants' conduct has an adverse effect on the potential market for briefs and pleadings, as they surely do.

The facts regarding a potential market are analogous to a recent situation addressed by the Ninth Circuit Court of Appeals.  In *Monge v. Maya Magazines, Inc*., 688 F.3d 1164 (9th Cir. 2012), a celebrity couple sued Maya Magazines for copyright infringement for publishing the couple's previously unpublished wedding photos.  Maya Magazines claimed fair use.  In analyzing that claim, the Ninth Circuit considered the fact that the plaintiffs – like the Plaintiff here – did not seek to market the photos and, in fact, attempted to keep them from ever being published.

The Ninth Circuit explained that the magazine's acquisition of the photographs, and their publication, itself proved that there was not only a potential market for the photos, but also an actual market:

> Maya's purchase of the pictures unequivocally demonstrates a market for the couple's copyrighted pictures. And Maya is itself a participant in the market for celebrity wedding photos, as Issue 633 also featured pictures of another celebrity wedding with photos that the magazine purchased.

*Monge*, 688 F.3d at 1181-82.  Here, as in *Monge*, the Defendants' acquisition of the Works, as well as other briefs and pleadings, and the subsequent sale and distribution of that material by the Defendants, "demonstrates a market" for the Works.

Moreover, it is disingenuous for the Defendants to argue, as they do, that no one would pay a licensing fee for attorneys' briefs and pleadings.  Defendants' usurpation of the right to publish these materials has pre-empted the creation of any competing service, or licensing regime, that would pay attorneys a fee for their works.  By simply *taking* the briefs and pleadings, the Defendants – who indisputably occupy the vast majority of the market for legal research – have preempted the potential market for the *licensing* of such briefs by their authors.

Finally, the Court cannot view the market impact factor in isolation.  The Supreme Court has explained that "when a commercial use amounts to mere duplication of the entirety of an original it clearly supersede[s] the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur.  *Campbell*, 510 U.S. at 591.  Here, the Defendants' "commercial use amounts to mere duplication of the entirety of the original."  *Id.*  Therefore, it is reasonable to presume market harm.

For all these reasons, the Defendants cannot carry their burden of showing that the fourth factor favors a finding of "fair use."

### E.   The Defendants' argument that they are providing a public benefit does not support a finding of "fair use"

The Defendants also argue that they provide a valuable "public" service by making briefs and pleadings widely available.

As an initial matter, their argument that the briefs and pleadings are already widely available directly contradicts their argument as to the alleged public benefit that they provide.  It is true, as Defendants point out, that anyone has the ability to obtain a PACER account, or go to a courthouse, and copy briefs and pleadings.  But that fact merely demonstrates that the Defendants' copying and sale of briefs and pleadings is not necessary in order to provide the public with access to court documents.  Court dockets were open to the pubic[8] long before the Defendants began their bulk download and sale

---

[8] The Defendants repeatedly refer to the "public" right to access court documents, and suggest that they are providing a "public" benefit by affording greater access to judicial documents.  *See, e.g.* West SJ Br. at p. 12 (arguing that West "helps to educate the public as to the workings of our justice system").  In reality, the Defendants have presented no evidence that their briefs and pleadings offerings are utilized by any significant portion of the "public" – other than attorneys and law students, who presumably are proficient at obtaining court documents through PACER or from a court

(*footnote continued on next page*)

of briefs and pleadings and court records will remain open whether or not the Defendants make a profit by stealing the work of others.  As West put it, "with a PACER account and a few clicks of a computer mouse, anyone can obtain electronic copies of briefs filed through PACER with any federal court." [West SJ Br. at p. 1] In light of the ease with which users can obtain briefs and pleadings from an official (non-commercial) source, there is no merit to the Defendants' argument that they are providing an essential public service, or that the public's interest in open access to the courts will be hindered if the Defendants cannot copy and sell briefs and pleadings for their own commercial gain.

West also argues that, "[i]f litigants such as Plaintiff…having committed [their legal briefs] to public scrutiny via court filings, [were able to] to condition public access to them upon paying a fee, these important public purposes would be impeded."  [West SJ Br. at p. 3]   This is a remarkable argument in light of the fact that the Defendants *do* "condition access to [the documents in their databases] upon paying a fee."  In fact, the fees charged by the Defendants are substantially higher than the fees charged by public sources, such as PACER.  If attorneys and law firms received fees for the sale of their briefs through private, commercial databases, it would no more "impede" pubic access to the courts than the fact that the Defendants themselves already charge subscribers for such briefs.  It is simply a matter of who receives the fee: the authors who created the works, or only those who copied them.

Also, the fact that the public (however defined) may derive benefit from access to copyrighted works is not a sufficient argument for "fair use."  An infringer can *always*

---

file.  Thus, Defendants have not demonstrated that their services make access to the courts any more widely available, as opposed to just more convenient for the legal community.

claim that free access to the works of others will be a benefit to the public.  But, "[t]he fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."  *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos*., 621 F.2d 57, 61 (2d Cir. 1980), cited with approval in *Harper & Row*, 471 U.S. at 558.

West also eloquently (but erroneously) argues that, though its unauthorized sale of briefs and pleadings, it is advancing the law as an "accretive body of learning," which is essential to advancing "legal doctrine, scholarship, and precedents based on past advocacy."  [West SJ Br. at p. 3]  With all respect to the creative and inventive work of attorneys in private practice, the briefs they write are not law, and are rarely, if ever, cited in judicial opinions beyond the cases in which they are filed.  The actual expression in the briefs and pleadings is hardly necessary for effective advocacy in subsequent cases. (Neither West nor Lexis cites a single legal brief or pleading in their own memoranda of law on these motions.)  Instead, the obvious purpose of the Defendants' offerings is to allow practitioners to take short cuts in their own legal research by copying the work of those who came before them, even if that involves a simple cut-and-paste from the Defendants' text-searchable databases. When the Defendants offer legal briefs and pleadings, they are not engaged in a high-minded effort to advance an "accretive body of learning."  *Id*.  They are selling an easy way to plagiarize.

Interestingly, every one of the Defendants' pubic policy arguments for "fair use" – that it will contribute to the "accretive body of learning," [West SJ Br. at p. 3], or that it "provides the opportunity to learn about new areas of law, analyze successful and unsuccessful legal arguments, and research specific jurisdictional formats and related issues," [Lexis SJ Br. at p. 21] – could be applied with equal or greater force to justify the

free and widespread copying and distribution of Defendants' own legal treatises. Surely, the body of legal knowledge and understanding of our court system would be greatly advanced by the free distribution of such treatises to all attorneys and law students who asked for a copy. Or, more directly, it would be of great "public benefit" to place all of West's and Lexis's legal treatises into a giant text-searchable electronic database with hyperlinks to cases and statutes. Obviously, the public interest in advancing legal scholarship and learning does not trump the Defendants' copyright interests in their treatises.

Whether the public would benefit from free copying is not, and cannot be, the standard by which copyright infringement is measured. As Judge Chin recently found, in rejecting a settlement involving Google's book scanning project, the wholesale copying of millions of works undoubtedly provides a public benefit:

> The benefits of Google's book project are many. Books will become more accessible. Libraries, schools, researchers, and disadvantaged populations will gain access to far more books. Digitization will facilitate the conversion of books to Braille and audio formats, increasing access for individuals with disabilities. Authors and publishers will benefit as well, as new audiences will be generated and new sources of income created. Older books — particularly out-of-print books, many of which are falling apart buried in library stacks — will be preserved and given new life

*Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 670 (S.D.N.Y. 2011). And yet, even after recognizing that public benefit, Judge Chin found that "[a] copyright owner's right to exclude others from using his property is fundamental and beyond dispute." *Id.* at 681. Simply put, copyright infringement cannot be justified by the public benefits of verbatim copying of whole works. Instead, "[t]he public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts." *Harper & Row*, 471 U.S. at 558 (quoting *Iowa State University Research Foundation*, 621 F.2d at 61).

Just as the wholesale digitization of books, or the free distribution of legal treaties, would provide a public benefit, but cannot trump copyright law, the Defendants' unauthorized use of other's works cannot be excused by arguing that author's rights under the Copyright Act must yield to a claimed "public interest" in distributing those works without the author's permission.

## II.   Defendants did not have an express or implied license to copy, distribute, and display the Works.

Lexis argues (and West joins in Lexis's argument) that the Defendants had an implied "license" to copy, distribute, and display the works.

As explained in Plaintiff's own Motion for Summary Judgment, it is undisputed that Plaintiff did not grant the Defendants any express license to exploit the Works, and Defendants do not now argue that there was any express license.

The Defendants, therefore, are left to argue that there was an "implied license." But "an implied license to use a copyrighted work 'cannot arise out of the unilateral expectations of one party.' There must be objective conduct that would permit a reasonable person to conclude that 'an agreement had been reached.'" *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (quoting *Allen-Myland v. International Bus. Mach. Corp.*, 746 F. Supp. 520, 549 (E.D. Pa. 1990)). *See also SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) (finding no implied license when "there is no evidence of a meeting of the minds between plaintiff and defendant").

Here, Defendants never spoke with Plaintiff about his Works (until this lawsuit), much less had a "meeting of the minds" that would grant them an implied license. They nevertheless argue that Plaintiff consented to Defendants' copying because he knew that "filing briefs in federal court rendered the Briefs publicly available," and that "PACER

18

permitted and indeed encouraged copying of the Briefs." [Lexis SJ Br. at p. 24]

Whatever Plaintiff's expectation was with respect to what the PACER system would do

with his Works, the Defendants cannot leverage that knowledge into implied consent that

*they* could use the works.

Nor is it relevant that Plaintiff did not contact the Defendants prior to the

institution of this lawsuit.  [*See* Lexis SJ Br. at p. 24]  Whatever Plaintiff did or did not do

*after* Defendants copied the Works cannot evidence Plaintiff's "implied consent" for the

copying that came before.

Neither of the cases cited by the Defendants on this issue found an implied license

in circumstances remotely similar to those here.  *EMI Latin v. Bautista,* 2003 U.S. Dist.

LEXIS 2612, *37 (S.D.N.Y. Feb. 24, 2003) was a dispute between a former band member

and his former band and record label.  The former band member admitted granting

permission to the band to use certain songs, promoting the album, and accepting

payments for it.  Judge Pauley found that the former band member "never expressly

rescinded the license to use the Recording." *Id.  EMI Latin*, therefore, hardly stands for

the proposition that an implied license can be found when a party has never had any

dealings with the author, as is the case here.

In *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006), the author of web

pages sued over Google's creation of "cached" versions of his web pages. The court

found that the author of the pages knew he could include a "do not archive" meta-tag in

the code for the website to prevent Google from creating a cache, but that he "chose not

to include the no-archive meta-tag on the pages of his site" and that "[h]e did so, knowing

that Google would interpret the absence of the meta-tag as permission to allow access to

the pages via 'Cached' links." *Id. at* 1116.

Here, in contrast to *EMI Latin* and *Field*, Defendants can point to nothing evidencing Plaintiff's assent to their copying.  The only overt conduct was Plaintiff's filing of the Works with the Clerk of Court, which Plaintiff was required to do for reasons completely independent of expressing his assent to further copying by the Defendants.  That filing did not manifest a "meeting of the minds," *SHL Imaging,* 117 F. Supp. 2d at 317, between Plaintiff and Defendant, and therefore cannot form the basis for finding an implied license.

Finally, the Defendants' argument would lead to a massive expansion of the idea of an implied license, well beyond its current application.  There was nothing special about Plaintiff's dealings with Defendants (in fact, there were none).  Therefore, the Defendants' implied license argument requires that this Court find that every attorney and law firm that ever filed a document in court had a "meeting of the minds" with the Defendants, and that the Defendants were granted an implied license by every one of those attorneys and firms with respect to millions of individual documents.  The Defendants can cite no authority for the proposition that an entire class of works, comprising millions of individual documents, created by uncounted numbers of individual authors, can be found to be subject to an implied license.

For all these reasons, Defendants' implied license argument should be rejected.

## III.   Plaintiff is Entitled to Remedies for Defendants' Infringement.

West (but not Lexis) argues that Plaintiff is not entitled to statutory damages and attorneys' fees because West's copyright infringement commenced before the effective date of registration of the Works, and the Works are unpublished.[9]  This does not mean,

---

[9] Even if infringing activity began before registration, Plaintiff is entitled to statutory damages from Lexis.

however, that Plaintiff is without remedies against West.  First, West concedes that Plaintiff may be entitled to disgorgement of profits, declaratory relief, and costs.

Second, Plaintiff is entitled to injunctive relief against West.   The harm suffered by Plaintiff from West's unlawful copying and distribution of Plaintiff's justifies an injunction.  "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).  *See also WPIX, Inc. v. IVI, Inc.*, 2012 U.S. App. LEXIS 18155, 25 (2d Cir. Aug. 27, 2012) ("Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss.").

Plaintiff readily acknowledges, and Defendants can hardly dispute, that it is difficult to measure Plaintiff's damages from Defendants' unlawful use of the Works. Plaintiff will never know if, for example, Plaintiff has lost clients as a result of a completing attorney's appropriation of Plaintiff's work product.  More fundamentally, as discussed above, "[a] copyright owner's right to exclude others from using his property is fundamental and beyond dispute." *Authors Guild v. Google Inc*., 770 F. Supp. 2d at 681. Defendants' unlawful use of Plaintiff's Works, therefore, involves "a loss that [Plaintiff] should not be expected to suffer." *Salinger v. Colting*, 607 F.3d at 81.

An injunction is also appropriate because the Defendants continue to copy and sell briefs and pleadings on a massive scale.  "[W]here a defendant provides no assurances that it will cease its infringing activity, this fact suggests that monetary damages are insufficient.*" Pretty Girl, Inc. v. Pretty Girl Fashions, Inc*., 778 F. Supp. 2d 261, 270 (E.D.N.Y. 2011) (trademark case).  Here, West has given no indication that it intends to stop offering copied briefs and pleadings for sale.  Quite the contrary.

While West argues that an injunction "would jeopardize its ability to continue to make court filings available to subscribers" because "the transaction costs involved in securing the necessary rights would present an insuperable obstacle" to its continuing to offer its product.  [West SJ Br. at p. 24]  West, however, is arguing that an injunction against copying *all* briefs and pleadings would be burdensome.  The only issue with respect to an injunction in this case, though, is whether West should be enjoined from copying *Plaintiff's* briefs and pleadings.  Such an injunction would hardly be burdensome to West, especially in light of its argument that it has copied little of Plaintiff's work, that such works have been little accessed, and that they have been removed from West's databases.

## Conclusion

The Defendants' Motions for Summary Judgment should be denied.

Dated:  New York, New York
October 23, 2012

GREGORY A. BLUE, P.C.

By:     /s/ Gregory A. Blue     
Gregory A. Blue
The Chrysler Building
405 Lexington Avenue, Suite 2600
New York, NY 10174
Telephone: (646) 351-0006
Facsimile: (212) 208-6874
blue@bluelegal.us

Raymond A. Bragar
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Ave., Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Facsimile: (212) 208-2519
bragar@bespc.com

*Attorneys for Plaintiff*

22